IN THE COURT OF APPEALS OF NORTH CAROLINA

Nos. COA15-1026 and 15-1033

Filed: 5 April 2016

Stanly County, Nos. 14 CVS 1038 and 14 CVS 1039

N.C. DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF MEDICAL ASSISTANCE, Petitioner,

v.

PARKER HOME CARE, LLC, Respondent,

and

DIVISION OF MEDICAL ASSISTANCE, N.C. DEPARTMENT OF HEALTH and HUMAN SERVICES, Petitioner,

v.

PARKER HOME CARE, LLC, Respondent.

Appeal by petitioner from orders entered 23 March 2015 by Judge Theodore S. Royster in Stanly County Superior Court. Heard in the Court of Appeals 9 February 2016.

*Attorney General Roy Cooper, by Special Deputy Attorney General Michael T. Wood, for the State in Case No. COA 15-1026.*

*Attorney General Roy Cooper, by Assistant Attorney General Brenda Eaddy, for the State in Case No. COA 15-1033.*

*Parker Poe Adams & Bernstein LLP, by Matthew W. Wolfe and Varsha D. Gadani, for respondent-appellee.*

ZACHARY, Judge.

The North Carolina Department of Health and Human Services (appellant, hereafter "DHHS"), appeals from orders denying its petitions for judicial review of orders entered by the North Carolina Office of Administrative Hearings (OAH). Upon careful review, we conclude that the trial court's orders should be affirmed.

Introduction

"Medicaid is a federal program that subsidizes the States' provision of medical services to . . . 'individuals, whose income and resources are insufficient to meet the costs of necessary medical services.' [42 U.S.C.A.] §1396-1." *Armstrong v. Exceptional Child Ctr., Inc.*, __ U.S. __, __, 135 S. Ct. 1378, 1382, 191 L. Ed. 2d 471, 476 (2015). "Medicaid offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions." *Id.* Pursuant to certain federal requirements, discussed in detail below, DHHS entered into a contract with Public Consulting Group (PCG), a private company, for the purpose of having PCG conduct post-payment audits of Medicaid claims payments to health care providers. Parker Home Care, LLC (Parker) is a provider of health care services, including services for which it receives reimbursement from Medicaid funding. In both of the cases on appeal, PCG conducted an audit of a small fraction of Parker's Medicaid claims, found what it determined to be Medicaid overpayments to Parker, and mathematically extrapolated the results of its audit to reach the "tentative" determination that Parker "owed" DHHS a much

larger sum. In each case, PCG sent Parker a letter (hereafter a "TNO") with the heading "TENTATIVE NOTICE OF OVERPAYMENT," setting out the results of its audit and informing Parker of its right to appeal the tentative results of PCG's audit. Several months later, DHHS suspended Parker's Medicaid reimbursement payments on unrelated claims in order to satisfy Parker's "debt" to DHHS as calculated by PCG based on the results of PCG's audit. Parker then sought a reconsideration review of DHHS's decision to suspend payments. DHHS refused to grant Parker a reconsideration review, on the grounds that Parker had failed to note an appeal from the TNO sent by PCG within the time limits applicable to contested case hearings before the OAH. Parker petitioned for a contested case hearing with the OAH, which ruled in favor of Parker. DHHS sought judicial review in Stanley County Superior Court, which also ruled for Parker.

During this litigation, DHHS has relied exclusively upon its argument that the TNO issued by PCG constituted notice of an adverse determination or final decision by DHHS and, as such, triggered the time limits for noting an appeal to the OAH. DHHS contends that, because Parker did not note an appeal from the TNO sent by PCG, neither the OAH nor the superior court had subject matter jurisdiction over Parker's appeal. As a result, the dispositive question before this Court is whether the TNO mailed by PCG to Parker was notice of a final decision by DHHS, such that the time limits for appealing from an adverse determination by DHHS started to run

when Parker received the TNO. After careful review of the applicable state and federal laws, regulations, and relevant jurisprudence, we conclude that the TNO did not constitute notice of a final decision by DHHS, that the OAH and the trial court had jurisdiction, and that the trial court's orders should be affirmed.

## I. Background

### A. Appellate Case No. COA 15-1026

On 16 May 2012, Parker received a TNO from PCG, informing it that PCG had conducted a post-payment review of a small number of Parker's past Medicaid claims and determined that Parker had been overpaid by $3,724.08. PCG mathematically extrapolated this finding and arrived at a "tentative overpayment amount" of $391,797.00. Parker did not respond to the TNO. In January 2014, DHHS suspended payment of all Medicaid claims from Parker in order to satisfy Parker's "debt" of $391,797.00. DHHS refused to grant Parker's request for a reconsideration review of the agency's decision to withhold payments to Parker, on the grounds that Parker had failed to "appeal" from the TNO in a timely manner.

On 31 January 2014, Parker filed a petition for a contested case hearing with the OAH. On 7 February 2014, Administrative Law Judge ("ALJ") Melissa Owens Lassiter granted Parker's motion for a temporary restraining order barring DHHS from "withholding or recouping funds from [Parker's] Medicaid payments." On 19 February 2014, DHHS made an oral motion to dismiss Parker's petition for lack of

subject matter jurisdiction, which was denied by ALJ Lassiter in an order entered 17 March 2014.

On 30 July 2014, a contested case hearing on this case and the companion case discussed below was conducted before ALJ J. Randolph Ward. At this hearing, DHHS presented no evidence on the substantive issue of Parker's alleged receipt of overpayments from Medicaid, but relied exclusively on its defense that the OAH lacked subject matter jurisdiction to hear the matter. On 7 October 2014, ALJ Ward issued a final decision denying DHHS's motion to dismiss and holding that "PCG did not have authority to act in place of the agency in the context of statutorily required steps towards a decision from which the Petitioner would need to contest with an appeal to OAH." In his order, ALJ Ward granted Parker's motion for directed verdict, ruling that because DHHS had offered no evidence, Parker was entitled to judgment as a matter of law. ALJ Ward ordered that "[DHHS's] decision to withhold funds alleged to be due in the "Tentative Notice of Overpayment" dated May 4, 2012, prepared by [DHHS's] contractor Public Consulting Group, . . . must be REVERSED" and that "[DHHS] is permanently enjoined from withholding any of the referenced funds[.]" On 9 October 2014, the OAH issued an amended final decision adding information about exhibits introduced at the hearing. DHHS filed a petition for judicial review of the OAH's final decision on 5 November 2014.

On 9 March 2015, the trial court conducted a combined hearing on DHHS's petitions for judicial review of the OAH's final decision in this case and in the companion case, discussed below. DHHS again relied solely on its defense of lack of subject matter jurisdiction, and did not offer evidence on any substantive issue. On 23 March 2015, the trial court entered an order affirming the OAH's final decision. DHHS entered timely notice of appeal to this Court.

## B. Appellate Case No. COA 15-1033

On 15 December 2011, Parker was sent a TNO from PCG, informing Parker that PCG had conducted a post-payment review of a small percentage of Parker's past Medicaid claims and had tentatively identified improperly paid claims in the amount of $7,908.24. PCG extrapolated this result and reached a tentative determination that Parker owed a total of $594,741.00 to DHHS. Parker did not respond to the TNO. In October 2012, DHHS began withholding payment of all Medicaid claims to Parker in order to satisfy Parker's $594,741.00 "debt" to DHHS. On 17 October 2012, DHHS denied Parker's request for a reconsideration review of the alleged overpayment. On 3 December 2012, Parker filed a petition for a contested case hearing before the OAH. DHHS moved to dismiss Parker's petition for a contested case hearing, on the grounds that the OAH lacked subject matter jurisdiction over the matter because Parker had failed to appeal from the TNO within the time limits for appealing an adverse determination by DHHS.

On 14 December 2012, ALJ Beecher R. Gray entered an order denying DHHS's motion to dismiss Parker's petition and enjoining DHHS from further withholding of Parker's Medicaid claims payments. On 24 January 2013, DHHS filed a petition in superior court for "writs of *certiorari*, prohibition, and mandamus" to stay the effect of ALJ Gray's order. On 27 February 2013, Judge Reuben F. Young entered an order denying DHHS's petition. A contested case hearing on this case and the companion case discussed above was conducted before ALJ Ward on 30 July 2014. DHHS did not offer evidence on the substantive issues, but relied only on its defense of lack of subject matter jurisdiction. On 6 October 2014, ALJ Ward issued a final decision denying DHHS's motion to dismiss Parker's petition for lack of subject matter jurisdiction, entering a directed verdict for Parker, and ordering that "[DHHS's] decision to withhold funds alleged to be due in the "Tentative Notice of Overpayment" dated December 15, 2011, prepared by [DHHS's] contractor Public Consulting Group . . . must be REVERSED" and that "Respondent is permanently enjoined from withholding any of the referenced funds[.]"

DHHS sought judicial review of the OAH's final decision, and a hearing was conducted before the trial court in this case and the companion case on 9 March 2015. On 23 March 2015, the trial court entered an order affirming the OAH's final decision. DHHS has appealed to this Court.

## II. Consolidation of Cases

In each of the two cases before us, DHHS is the appellant and Parker is the appellee. In each case, (1) Parker took no immediate action in response to a TNO it received from PCG; (2) when Parker learned, many months later, that DHHS was withholding payment of Parker's Medicaid claims in reliance upon the results of PCG's audit, Parker sought review of the decision to withhold funds; (3) DHHS refused to review or reconsider its decision and, (4) DHHS relied on the defense that neither the OAH nor the trial court had subject matter jurisdiction because Parker had not appealed from the TNO letter within the time limits set by the Administrative Procedure Act (APA) for appeal to the OAH. Both cases present the same fundamental issue, which is whether the TNO constituted notice of a final decision by DHHS that triggered the time limits for appeal to the OAH. The resolution of each case requires analysis of the same state and federal statutes and regulations, and neither case requires the resolution of disputed issues of fact. In addition, the cases were consolidated before the ALJ who issued the final decision in both cases, and also before the trial court. During the hearing before the trial court, DHHS acknowledged that in both cases "the underlying legal argument for the Court is the same." Because "both appeals involve common questions of law" the Court has consolidated "these appeals for the purpose of rendering a single opinion on all issues properly before the Court." *Putman v. Alexander*, 194 N.C. App. 578, 580, 670 S.E.2d 610, 613 (2009).

### III.  Standard of Review

"For questions of subject matter jurisdiction, the standard of review is *de novo*[.]" *Harper v. City of Asheville*, 160 N.C. App. 209, 213, 585 S.E.2d 240, 243 (2003) (citation omitted).  " 'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal.' " *Fields v. H&E Equipment Services, LLC*, __ N.C. App. __, __, 771 S.E.2d 791, 793-94 (2015) (quoting *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008)).  Moreover, "[w]here a trial court has reached the correct result, the judgment will not be disturbed on appeal even where a different reason is assigned to the decision." *Eways v. Governor's Island*, 326 N.C. 552, 554, 391 S.E.2d 182, 183 (1990) (citing *Shore v. Brown*, 324 N.C. 427, 378 S.E.2d 778 (1989), and *Sanitary District v. Lenoir*, 249 N.C. 96, 99, 105 S.E.2d 411, 413 (1958)) (other citation omitted).  Thus, " 'a trial court's ruling must be upheld if it is correct upon any theory of law[,] and . . . should not be set aside merely because the court gives a wrong or insufficient reason for [it].' " *Templeton v. Town of Boone*, 208 N.C. App. 50, 54, 701 S.E.2d 709, 712 (2010) (quoting *Opsahl v. Pinehurst Inc.*, 81 N.C. App. 56, 63, 344 S.E.2d 68, 73 (1986), *disc. review improvidently allowed*, 319 N.C. 222, 353 S.E.2d 400 (1987)).  In this case, we conclude that the ALJs and the trial court correctly ruled that each had subject matter jurisdiction over this matter.  Accordingly, we uphold the trial court's orders

affirming the orders of the ALJs without regard to the merits of the reasons cited in the trial court's orders or the interlocutory orders issued by the ALJs.

## IV.  Legal Principles

### A.  Federal Statutes and Regulations

Federal law establishes certain requirements to which a state's Medicaid program must adhere. "The federal and state governments share the cost of Medicaid, but each state government administers its own Medicaid plan. State Medicaid plans must, however, comply with applicable federal law and regulations. See 42 U.S.C. § 1396c; 42 C.F.R. § 430.0." *Shakhnes v. Berlin*, 689 F.3d 244, 247 (2nd Cir. 2012), *cert. denied*, __ U.S. __, 133 S. Ct. 1808, 185 L. Ed. 2d 812 (2013).  For the purposes of this appeal, the most significant of these requirements are the regulations that (1) require a state to designate a single state agency to administer its Medicaid program, (2) limit the circumstances in which that single state agency may delegate its responsibility for administration of the state's Medicaid program, and (3) direct the states to establish a system to ensure the integrity of the state's Medicaid program.

### 1. Single State Agency

42 U.S.C.A. § 1396a(a)(5) states in relevant part that a state Medicaid program "must . . . provide for the establishment or designation of a single State agency to administer or to supervise the administration of the plan[.]"

At the heart of our inquiry is Congress' pronouncement that each state must "provide for the establishment or designation of a single State agency to administer or to supervise the administration" of its Medicaid program, 42 U.S.C. § 1396a(a)(5), a command we shall refer to as the 'single state agency requirement.' . . . [T]he single state agency requirement . . . ensures that final authority to make the many complex decisions governing a state's Medicaid program is vested in one (and only one) agency. The requirement thereby avoids the disarray that would result if multiple state or even local entities were free to render conflicting determinations about the rights and obligations of beneficiaries and providers.

*K.C. v. Shipman*, 716 F.3d 107, 112 (4th Cir. 2013).  In addition, 42 C.F.R. 431.10(b)(1) specifies that a "State plan must" "(1) Specify a single State agency established or designated to administer or supervise the administration of the plan[.]"

## 2.  Limits on Delegation of Authority

Implicit in the single state agency rule is the corollary requirement that only that agency may administer a state's Medicaid program.  In this regard, 42 C.F.R. 431.10(e) specifically provides that "[t]he Medicaid agency may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters."

[T]he single state agency requirement represents Congress's recognition that in managing Medicaid, states should enjoy both an administrative benefit (the ability to designate a single agency to make Final decisions in the interest of efficiency) but also a corresponding burden (an accountability regime in which that agency cannot evade federal requirements by deferring to the actions of other entities). . . .  In this case, there is no dispute that North

- 11 -

Carolina law designates the NCDHHS as the agency responsible for operating the state's Medicaid plan. N.C. Gen. Stat. § 108A-54. . . . Federal and state law thus interlock, establishing the following propositions: the NCDHHS is the "single State agency" with the final responsibility to administer the state's Medicaid program under 42 U.S.C. § 1396a(a)(5)[.]  (emphasis added).

*Shipman*, 716 F.3d at 112-13 (citing *San Lazaro Ass'n v. Connell*, 286 F.3d 1088, 1100-01 (9th Cir.), *cert. denied*, 537 U.S. 878, 123 S. Ct. 78, 154 L. Ed. 2d 133 (2002)).

### 3. Medicaid Integrity Program

42 U.S.C.A. § 1396u-6 establishes the Medicaid Integrity Program and provides, as relevant to this appeal, that:

(a)   There is hereby established the Medicaid Integrity Program . . . under which the Secretary shall promote the integrity of the program . . . by entering into contracts in accordance with this section with eligible entities to carry out the activities described in subsection (b).

(b) [The] Activities described in this subsection are as follows:

   (1) Review of the actions of individuals or entities furnishing items or services . . . to determine whether fraud, waste, or abuse has occurred[.] . . .

   (2) Audit of claims for payment for items or services furnished, or administrative services rendered, under a State plan under this subchapter[.]

   (3) Identification of overpayments to individuals or entities receiving Federal funds under this subchapter[.]

   (4) Education or training, . . . (emphasis added).

42 U.S.C.A. § 1396(a)(42)(B)(i) directs each state to "establish a program under which the State contracts . . . with 1 or more recovery audit contractors for the purpose of identifying underpayments and overpayments and recouping overpayments under the State plan[.]" 42 U.S.C.A. § 1396(a)(42)(B)(ii) requires that a state's Medicaid integrity program must "provide assurances satisfactory to the Secretary that--

> (I) under such contracts, payment shall be made to such a contractor only from amounts recovered;
>
> (II) from such amounts recovered, payment. . . shall be made on a contingent basis for collecting overpayments; and . . .
>
> (III) the State has an adequate process for entities to appeal any adverse determination made by such contractors; and
>
> (IV) such program is carried out in accordance with such requirements as the Secretary shall specify[.] . . .

Similarly, 42 C.F.R. § 455.200(a) "implements section 1936 of the Social Security Act that establishes the Medicaid Integrity Program, under which the Secretary will promote the integrity of the program by entering into contracts with eligible entities to carry out the activities under this subpart[.]" 42 C.F.R. § 455.232 provides that:

> The contract between CMS and a Medicaid integrity audit program contractor specifies the functions the contractor will perform. The contract <u>may include any or all of the following</u> functions:

(a) <u>Review</u> of the actions of individuals or entities furnishing items or services . . . to determine whether fraud, waste, or abuse has occurred, [or] is likely to occur[.]

(b) <u>Auditing of claims</u> for payment for items or services furnished, or administrative services rendered, under a State Plan . . . to ensure proper payments were made. . . .

(c) <u>Identifying if overpayments have been made</u> to individuals or entities receiving Federal funds[.] . . .

(d) <u>Educating</u> providers of service, managed care entities, beneficiaries, and other individuals with respect to payment integrity and quality of care. (emphasis added).

These regulations establish that, notwithstanding the general rule that the single state agency may not delegate its "authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters," DHHS is expressly authorized to contract with private companies for the purpose of identification and recoupment of overpayments to health care providers. Consistent with the requirement that the state agency not delegate its discretionary authority, the enumerated purposes for which DHHS may contract with a private company do not include the authority for a private contractor to make discretionary policy decisions or discretionary decisions in individual cases on behalf of the state agency administering a state's Medicaid program. "The designated state agency may not delegate to any other agency the authority to exercise discretion in administering the program. See 42 C.F.R. 431.10(e). However, the single state agency may subcontract

certain functions that do not involve a delegation of discretionary authority." *Azer v. Connell*, 306 F.3d 930, 933 (9th Cir. 2002). This limitation is particularly appropriate, given that federal regulations specify that a private contractor such as PCG should be paid on a contingent fee basis from the funds that are recouped from health care providers pursuant to the contractor's audits, clearly giving the private contractor a conflict of interest in the matter.

### B.  North Carolina State Statutes and Regulations

#### 1. Introduction

The North Carolina Medicaid program was established by N.C. Gen. Stat. § 108A-54(a), which states that DHHS "is authorized to establish a Medicaid Program in accordance with Title XIX of the federal Social Security Act. The Department may adopt rules to implement the Program." In recognition of the requirement that state Medicaid programs must comply with federal Medicaid regulations, N.C. Gen. Stat. § 108A-56 provides in relevant part that "[a]ll of the provisions of the federal Social Security Act providing grants to the states for medical assistance are accepted and adopted, and the provisions of this Part shall be liberally construed in relation to such act so that the intent to comply with it shall be made effectual."

#### 2. Appeal from Medicaid Decisions

Judicial review of the final decision of an administrative agency in a contested case is governed by N.C. Gen. Stat. § 150B–51 (2013), which "governs both trial and

appellate court review of administrative agency decisions." *N. C. Dept. of Correction v. Myers*, 120 N.C. App. 437, 440, 462 S.E.2d 824, 826 (1995), *aff'd per curiam*, 344 N.C. 626, 476 S.E.2d 364 (1996). Under N.C. Gen. Stat. § 150B-23(a) (2013), a "contested case shall be commenced by . . . filing a petition with the Office of Administrative Hearings and, except as provided in Article 3A of this Chapter, shall be conducted by that Office." § 150B-23(f) provides in relevant part that:

> (f) Unless another statute or a federal statute or regulation sets a time limitation for the filing of a petition in contested cases against a specified agency, the general limitation for the filing of a petition in a contested case is 60 days. <u>The time limitation</u>, whether established by another statute, federal statute, or federal regulation, or this section, <u>shall commence when notice is given of the agency decision</u> to all persons aggrieved who are known to the agency[.] . . . The notice shall be in writing, and <u>shall set forth the agency action</u>, and shall inform the persons of the right, the procedure, and the time limit to file a contested case petition. . . . (emphasis added).

The APA applies to appeals by a Medicaid provider. N.C. Gen. Stat. § 108C-12 states in pertinent part that:

> (a) General Rule. -- Notwithstanding any provision of State law or rules to the contrary, this section shall govern the process used by a Medicaid provider or applicant to appeal an adverse determination made by the Department.
>
> (b) Appeals. -- Except as provided by this section, a request for a hearing to <u>appeal an adverse determination</u> of the Department under this section is a contested case subject to the provisions of Article 3 of Chapter 150B of the General Statutes. (emphasis added)

The term "adverse determination" is defined in N.C. Gen. Stat. § 108C-2, which provides in pertinent part that "[t]he following definitions apply in this Chapter:

> (1) Adverse determination. A <u>final decision by the Department</u> to deny, terminate, suspend, reduce, or recoup a Medicaid payment[.] . . .
>
> . . .
>
> (3) Department.--<u>[DHHS], its legally authorized agents, contractors</u>, or vendors who <u>acting within the scope of their authorized activities, assess, authorize, manage, review, audit, monitor, or provide services</u> pursuant to Title XIX or XXI of the Social Security Act, [or] the North Carolina State Plan of Medical Assistance[.] . . . (emphasis added).

Thus, the deadline for noting an appeal to the OAH begins when a health care provider receives written notice of a "final decision" by DHHS exercising its discretion to "deny, terminate, suspend, reduce, or recoup a Medicaid payment[.]"

<u>3. North Carolina Medicaid Integrity Program</u>

N.C. Gen. Stat. § 108C-5(b) provides in relevant part that "[i]n addition to the procedures for suspending payment set forth at 42 C.F.R. § 455.23 [pertaining to fraud, which is not alleged in the instant case], the Department may also suspend payment to any provider that (i) owes a final overpayment, assessment, or fine to the Department[.]" N.C. Gen. Stat. § 108C-5(b)(i) further states that "[p]rior to extrapolating the results of any audits, the Department shall demonstrate and inform the provider that (i) the provider failed to substantially comply with the requirements of State or federal law or regulation[.]"

The specific rules governing North Carolina's Medicaid integrity program are set out in the North Carolina Administrative Code (N.C.A.C.). 10 N.C.A.C. 22F.0101 states that "[t]his Subchapter shall provide methods and procedures to ensure the integrity of the Medicaid program." 10A N.C.A.C. 22F.0102 provides that DHHS "shall perform the duties required by this Subchapter" and that DHHS "may enter into contracts with other persons for the purpose of performing these duties." We note, however, that under 42 C.F.R. 431.10(e), DHHS may not "enter into contracts with other persons for the purpose" of delegating to its contractors The responsibility of DHHS for administration and supervision of North Carolina's Medicaid program, including its responsibility for rendering discretionary decisions that require the application of department policy to specific facts. N.C.A.C. regulations also provide in relevant part that:

> 2.  10A N.C.A.C. 22F.0103.
>
> (a) [DHHS] shall develop, implement and maintain methods and procedures for preventing, detecting, investigating, reviewing, hearing, referring, reporting, and disposing of cases involving fraud, abuse, error, overutilization or the use of medically unnecessary or medically inappropriate services.
>
> (b) The Division shall institute methods and procedures to:
>
> . . .

> (2) perform preliminary and full investigations to collect facts, data, and information;
>
> (3) analyze and evaluate data and information to establish facts and conclusions concerning provider and recipient practices;
>
> (4) make administrative decisions affecting providers, including but not limited to suspension from the Medicaid program;
>
> (5) recoup improperly paid claims;
>
> . . .
>
> (7) conduct administrative review or, when legally necessary, hearings[.] . . .

3.      10A N.C.A.C. 22F.0302.

> (a) Abusive practices shall be investigated according to the provisions of Rule .0202 of this Subchapter.
>
> (b) A Provider Summary Report shall be prepared by the investigative unit furnishing the full investigative findings of fact, conclusions, and recommendations.
>
> (c) <u>The Division shall review the findings, conclusions, and recommendations and make a tentative decision</u> for disposition of the case from among the following administrative actions:
>
> > (1) To place provider on probation with terms and conditions for continued participation in the program.

(2) To recover in full any improper provider payments.

(3) To negotiate a financial settlement with the provider.

(4) To impose remedial measures to include a monitoring program of the provider's Medicaid practice terminating with a "follow-up" review to ensure corrective measures have been introduced.

(5) To issue a warning letter notifying the provider that he must not continue his aberrant practices or he will be subject to further division actions.

(6) To recommend suspension or termination.

(d) <u>The tentative decision shall be subject to the review procedures described in Section .0400 of this Subchapter</u>.

4.    10A N.C.A.C. 22F.0402.

(a) Upon notification of a <u>tentative decision</u> the provider will be offered, in writing, by certified mail, the opportunity for a reconsideration of the tentative decision and the reasons therefor.

(b) The provider will be instructed to submit to the Division in writing his request for a Reconsideration Review within fifteen working days from the date of receipt of the notice. Failure to request a Reconsideration Review in the specified time shall result in the implementation of the tentative decision as the Division's final decision.

. . .

> (e) The Reconsideration Review decision will be sent to the provider in writing by certified mail within five working days following the date of review. It will state . . . that if the Reconsideration Review decision is not acceptable to the provider, he may request a contested case hearing in accordance with the provisions found at 10A NCAC 01. Pursuant to G.S. 150B-23(f), the provider shall have 60 days from receipt of the Reconsideration Review decision to request a contested case hearing. Unless the request is received within the time provided, the Reconsideration Review decision shall become the Division's final decision. . . . (emphasis added)

Thus, notwithstanding the assistance of private companies such as PCG, under the relevant N.C.A.C. regulations, DHHS retains the authority for supervision of the Medicaid integrity program and for making the discretionary decisions in particular cases. For example, 10A N.C.A.C. 22F.0103(b)(4) expressly states that DHHS will "make administrative decisions affecting providers[.]" 10A N.C.A.C. 22F.0302 provides that after a report is submitted to DHHS setting out the contractor's "investigative findings of fact, conclusions, and recommendations," it is <u>DHHS</u> that "shall review the findings, conclusions, and recommendations and make a tentative decision for disposition of the case from among" six administrative actions. Selection of the appropriate "administrative action" to take in response to a specific investigative report is clearly a discretionary decision requiring the application of policies developed by DHHS. Further, it is <u>DHHS's</u> "tentative decision" that is reviewed prior to <u>DHHS</u> making a final decision that is subject to review by the OAH.

We note that the "informal" reconsideration review of PCG's "tentative" audit results is not included in the N.C.A.C.'s regulations governing the Medicaid integrity program. This is apparently an additional level of review provided by DHHS. Upon review of the relevant provisions of the N.C.A.C., construed in the context of the federal regulations discussed above, we conclude that the N.C.A.C. regulations expressly provide for the following steps in an investigation into possible overpayments for Medicaid claims:

1. Under 10A N.C.A.C. 22F.0102, DHHS may enter into contracts with private companies such as PCG for the purpose of auditing the Medicaid claims of health care providers.

2. Under 10A N.C.A.C. 22F.0103(b), a private company such as PCG may "perform preliminary and full investigations to collect facts, data, and information" and "analyze and evaluate data and information." The private contractor will then prepare a summary report for DHHS.

3. Under 10A N.C.A.C. 22F.0302(c), after PCG submits its report, <u>DHHS</u> "shall review the findings, conclusions, and recommendations" and shall exercise its discretion to reach "a tentative decision for disposition of the case" from among six options.

4. Under 10A N.C.A.C. 22F.0402(a), a health care provider will be notified of the "tentative decision" reached by <u>DHHS</u>, after its review of the data gathered by PCG, and its exercise of discretion regarding the appropriate response.

5. The health care provider may request a reconsideration review of <u>DHHS</u>'s "tentative decision" within fifteen days.

Failure to do so will result in DHHS's implementing its tentative decision as its final agency decision.

6. Pursuant to N.C. Gen. Stat. § 150B-23(f), the time for appeal begins to run when DHHS notifies the health care provider of DHHS's "final decision" and of the provider's right to appeal from the agency's final decision to the OAH.

As discussed above, N.C. Gen. Stat. § 108C-2(3) defines DHHS to include "its legally authorized agents, contractors, or vendors who acting within the scope of their authorized activities, assess, authorize, manage, review, audit, monitor, or provide services[.]" We agree with DHHS's contention that "PCG's auditing activities are considered an agency action taken by [DHHS] because PCG acted within the scope of its authorized activities" in conducting an audit of Parker's Medicaid claims payments. We conclude, however, based upon review of (1) the rule stated in 42 C.F.R. 431.10(e), prohibiting DHHS from delegating to a private company the administrative supervision of its Medicaid program, (2) the federal regulations setting out the permissible purposes for which a private contractor may be hired as part of a state's Medicaid integrity program, and (3) the relevant provisions of the North Carolina statutes and the N.C.A.C., that both federal and state regulations clearly contemplate that the role of a private company will be limited to the performance of duties that do not include rendering a discretionary decision as to the most appropriate course of action in a particular case. We therefore hold that a private company such as PCG does not have the authority to substitute for DHHS by

reviewing its own audit, choosing the most appropriate response to a given factual situation, rendering DHHS's "tentative decision, or determining on behalf of DHHS that, unless a provider requests what DHHS admits is an "informal reconsideration review" that DHHS will conduct no additional review of PCG's "tentative" audit results. Simply put, these are decisions that require the exercise of discretion and the application of DHHS's policy priorities and, as such, cannot be delegated to a private contractor such as PCG.

In apparent recognition of this restriction, we note that DHHS did not argue at the trial level or on appeal that PCG was authorized to render a "final decision" on behalf of DHHS. As a result, a TNO does not constitute notice of an "adverse determination" unless it informs the recipient of a "final decision" by DHHS to "deny, terminate, suspend, reduce, or recoup a Medicaid payment."

## V. Legal Analysis

### A. The TNO

The TNOs were sent on PCG's letterhead, with the heading, in all caps and underlined, of "TENTATIVE NOTICE OF OVERPAYMENT." The TNO's are essentially the same, except for the specific overpayments that are alleged. The body of the letter delivered by PCG in COA No. 15-1026 states that: **(Rp 189)**

Dear PARKER HOME CARE, LLC:

[DHHS] and its authorized agents periodically conduct announced and unannounced audits and post-payment reviews of Medicaid paid claims in order to identify program abuse and overpayment(s) in accordance with 42 U.S.C. § 1396a, Parts 455 and 456 of Title 42 of the Code of Federal Regulations, N.C.G.S. 2011-399 and 10A NCAC Subchapter 22F. Public Consulting Group, Inc. (PCG) is a post-payment claims review contractor for DMA.

A post-payment review of a statistically valid random sample of your Medicaid paid claims for dates of service from 6/1/2010 to 9/30/2010 was recently completed. The results of the post-payment review revealed that your agency failed to substantially comply with the requirements of State and federal law or regulation including but not limited to the following:

. . .

DMA has tentatively identified the total amount of improperly paid claims in the sample to be $3,724.08. In accordance with 10A NCAC 22F.0606 and N.C. Session Law 2011-399, N.C.G.S. 108C-5, DMA or its agents are authorized to use a random sampling technique to calculate and extrapolate the total overpayment whenever a Medicaid provider fails to substantially comply with the requirements of State and federal law or regulation. You may challenge the determination of substantial non-compliance during the appeal process described below. In the event that you do not challenge this determination or your challenge is not successful, PCG has utilized random sampling and extrapolation in order to determine that your agency received a total Medicaid overpayment in the amount of $391,797.00. . . .

You may request a reconsideration review of this tentative decision in accordance with 10A NCAC 22F .0402. The request for reconsideration review must be submitted

within fifteen (15) working (business) days of receipt of this
letter. . . . (emphasis added).

. . .

If you are not challenging the extrapolation of result as
described in N.C.G.S. §108C-5(n) and you do not request a
reconsideration review within fifteen (15) working
(business) days of receipt of this letter or if you disagree
with the reconsideration review decision, you may file a
petition for a contested case hearing with the Office of
Administrative Hearings (OAH) in accordance with G.S. §
156B-23(a). You have sixty (60) calendar days from either
the date of this letter (if you do not request a
reconsideration review) or the date of the reconsideration
review decision to file a contested case petition with the
OAH. . . .

In accordance with 10A NCAC 22F .0402(e), unless a
request is filed at the [OAH] within the time provided, the
reconsideration review decision shall become the
Department's final decision. (emphasis added)

### B. Discussion

The issue in this appeal is whether the TNO constituted written notice of an

"adverse determination" by DHHS, defined as a "final decision" by DHHS. We

conclude that the TNO does not inform Parker of a decision reached by DHHS.

We initially note that the TNO's heading, "Tentative Notice of Overpayment,"

does not suggest that the TNO constitutes a final decision by DHHS. The TNO

discusses PCG's audit of a small fraction of Parker's Medicaid claims payments,

PCG's "tentative" determination that Parker was overpaid, and PCG's mathematical

extrapolation of the results of its audit. The TNO does not contain any reference to

- 26 -

a review by DHHS, or to a tentative decision by <u>DHHS</u> regarding PCG's audit. To the extent that the TNO thereby suggests that the results of its own "tentative" determination of overpayment will, without any review by DHHS, automatically become a "final decision" by <u>DHHS</u> unless Parker seeks an informal "reconsideration review" of PCG's tentative determination, PCG has misstated the applicable law and has purported to have the prerogative to act outside the scope of its authority. As discussed above, the N.C.A.C. provisions explicitly require that <u>DHHS</u> review PCG's investigative results, choose the appropriate administrative action, and make its own "tentative decision" that may be reviewed before DHHS renders a final decision.

We conclude that the relevant statutes and regulations do not support the conclusion that a private contractor's preliminary review of a small percentage of a provider's Medicaid claims payments is sufficient to establish, without any review or exercise of discretion by DHHS, that the provider owes DHHS a debt of hundreds of thousands of dollars. Although both the TNO and N.C.A.C. employ the word "tentative," the TNO informed Parker of the results of PCG's audit, and <u>did not</u> inform Parker of a "tentative decision" reached by DHHS based upon its review of the audit results, and its exercise of discretion to select the most appropriate response. As a result, the TNO appears to conflate the "tentative" results of PCG's audit with the tentative <u>decision</u> that can only be made by DHHS.

Moreover, the TNO itself states that unless Parker requests a reconsideration review, which DHHS concedes on appeal to be an "informal" review, PCG's preliminary audit results will become DHHS's final decision. Leaving aside the fact that the TNO thereby posits that DHHS will adopt PCG's "tentative" audit results as its own final decision without performing any of its required duties under the N.C.A.C., the TNO explicitly states that the "final decision" will be reached in the future. When this occurs, after DHHS reviews the results of PCG's audit, DHHS would <u>then</u> be required to notify Parker of its final decision.

We conclude that the TNO did not inform Parker of any "final decision" by DHHS. Because the TNO did not constitute notice of an adverse determination or final decision by DHHS, it did not trigger the time limits for Parker to note an appeal to the OAH. In reaching this conclusion, we have considered, but have ultimately rejected, DHHS's arguments for a contrary result.

N.C. Gen. Stat. § 108C-5 was amended effective 1 July 2014 to add N.C. Gen. Stat. § 108C-5(t), which provides that "[n]othing in this Chapter shall be construed to prohibit the Department from utilizing a contractor to send notices to providers on behalf of the Department." The parties have offered arguments on the question of whether PCG was authorized, prior to the amendment of N.C. Gen. Stat. § 108C-5, to communicate to Parker a final decision by DHHS. We conclude that this issue is

not pertinent to the present case, because the TNO does <u>not</u> inform Parker of a "final decision" rendered by DHHS.

DHHS also argues that in COA No. 15-1026 ALJ Lassiter erred by ruling in an interlocutory order that DHHS was required to send Parker two separate letters informing Parker of DHHS's final decision. We agree with DHHS that there is no statutory or regulatory requirement that after DHHS has rendered its final decision, DHHS must send two separate letters informing the health care provider of this fact. However, in the present case the TNO did not constitute notice of DHHS's final decision. Therefore, the "second letter" to which ALJ Lassiter refers would be the letter that constituted notice of DHHS's final decision.

The Medicaid program consists of a complex web of federal and state statutes and regulations that address a variety of policy issues in an extensive array of detailed procedural mandates. It would be unnecessary and inappropriate for our opinion to address issues that are outside the boundaries of the specific issues raised by this appeal. Accordingly, we note several issues that, although they may bear some relationship to audits performed under the Medicaid integrity program, are <u>not</u> addressed in this opinion.

We note, for example, that N.C. Gen. Stat. § 108C-5(b)(i) provides that "[p]rior to extrapolating the results of any audits, the Department shall demonstrate and inform the provider" that the "provider failed to substantially comply with the

requirements of State or federal law or regulation[.]" The TNO makes the conclusory assertion that Parker had "failed to substantially comply" with the relevant legal requirements, thus entitling PCG to extrapolate the results of its audit of a small fraction of Parker's Medicaid claims. Because it is not necessary to the resolution of the issues raised by the question of subject matter jurisdiction, we express no opinion on the extent to which the determination that a provider has "substantially" failed to comply with state or federal regulations is an exercise of discretion properly undertaken by DHHS, or on whether the results of PCG's preliminary audit are sufficient to demonstrate Parker's substantial failure to comply with the regulations governing Medicaid claims.

In addition, the instant case raises the issue of whether a TNO that informs a health care provider of a private contractor's "tentative" determination of an overpayment constitutes notice of a "final decision" by <u>DHHS</u>. Given that the TNO, by its plain language, provides notice of PCG's audit results <u>prior</u> to the required review by DHHS, we have no need to address, and express no opinion on, the issue of what evidence might be adequate to demonstrate that DHHS had performed its required functions. Finally, because we conclude that the trial court reached the correct result in its ruling that the superior court had subject matter jurisdiction over this matter, we do not address the parties' arguments on the application of the doctrines of *res judicata* or collateral estoppel to the present case.

For the reasons discussed above, we conclude that the trial court did not err in ruling that it had subject matter jurisdiction, and that the trial court's orders should be

AFFIRMED.

Judge BRYANT and Judge DILLON concur.